UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ARTHUR R. SEABORNE

v.                                              CASE NO. 8:12-cr-229-T-23TGW
                                                         8:13-cv-2819-T-23TGW
UNITED STATES
_____/


## O R D E R

Seaborne's motion to vacate under 28 U.S.C. § 2255 (Doc. 1) challenges the validity of his 2012 conviction for conspiring to commit bank fraud, for which he serves five years imprisonment followed by three years of supervised release.  Seaborne pleaded guilty and was sentenced under the terms of the plea agreement.  He presents eleven grounds alleging ineffective assistance of trial counsel and one ground challenging the length of his sentence.

## I. FACTS[1]

> At times material to the Superseding Information, the defendant was a resident of Sarasota, Florida, and a licensed mortgage broker in the State of Florida. The defendant served as President, Director and Registered Agent of Southeast Capital Investors, Inc. ("SC Investors"); Manager and Registered Agent of Southeast Capital Advisors, LLC ("SC Advisors"); Manager, Director and Registered Agent of Southeast Capital Properties, LLC ("SC Properties"); and President of Zip Line Properties, Inc. ("Zip Line").

---

[1]  This factual summary is from the plea agreement. (Doc. 25 in 8:12-cr-229)

SC Investors was a Florida corporation, headquartered in Sarasota, and it was purportedly engaged in the business of a real estate investment trust. In fact, SC Investors marketed and sold unregistered securities in the form of Real Estate Investment Trust Note Agreements to individual investors. The defendant used SC Investors to raise funds, which were subsequently loaned to clients of SC Advisors for said clients to use to make down payments in connection with their purchases of residential properties.

Southeast Capital Realty, LLC ("SC Realty") was a Florida limited liability company, headquartered in Sarasota, and it was engaged in the business of facilitating the purchase and sale of real estate. SC Realty identified and negotiated the purchase of residential properties, intended for subsequent sale to clients of SC Advisors, which residential properties were titled in the names of Florida limited liability companies. Zip Line was a Florida corporation headquartered in Sarasota and it was engaged in the business of forming Florida limited liability companies, which held title to residential properties, the purchase of which was handled by SC Realty.

SC Advisors was a Florida limited liability company, headquartered in Sarasota, and it was licensed to engage in the mortgage brokerage business. SC Advisors marketed a "no money down" residential purchase program, using funds raised via SC Investors to make loans to clients of SC Advisors for said clients to use to make down  payments in connection with their purchases of residential properties. Through SC Advisors, the defendant and co-conspirators prepared and submitted loan applications to lenders for purchase money mortgage loans and home equity loans on the properties purchased by clients of SC Advisors.

SC Properties was a Florida limited liability company, headquartered in Sarasota, and it was engaged in the business of property management. SC Properties identified and arranged for people to rent residential properties purchased by clients of SC Advisors. Although SC Properties also was to maintain the residential properties, collect rental payments made on the residential properties, and pay all expenses associated with the residential properties, including, but not limited to, loan payments and tax payments due, it failed to do so as to some properties.

- 2 -

Also at times material to the Superseding Information, World Savings Bank, FSB, and First National Bank of Arizona were federally-insured financial institutions in that their deposits were insured by the Federal Deposit Insurance Corporation.

Beginning on an unknown date, but at least as early as in or about March 2003, and continuing through in or about July 2008, in the Middle District of Florida, and elsewhere, the defendant and others conspired to commit bank fraud. Specifically, the defendant and co-conspirators carried out a scheme to defraud World Savings Bank and First National Bank of Arizona, among other lenders, by preparing and submitting, and causing to be prepared and submitted, to said federally-insured financial institutions applications for purchase money mortgages, which applications omitted material information and which included other material information that was false and fraudulent, for the purpose of defrauding said financial institutions.

As a part of this conspiracy, the defendant formed SC Investors and used it to raise funds via the sale of promissory notes. The defendant caused SC Realty to identify and negotiate the purchase of residential properties, which he intended to resell to clients of SC Advisors, and he used Zip Line to form limited liability companies (LLCs) to hold title to the residential properties purchased. The defendant titled the residential properties purchased in the names of the LLCs he had formed.

The defendant and co-conspirators used SC Advisors to market a "no money down" residential purchase program to individual clients. The program involved the defendant reselling the residential properties purchased via SC Realty and titled in the names of the LLCs formed by Zip Line to individual clients of SC Advisors. The program also involved using the funds raised via SC Investors' sale of 12-month promissory notes to make loans to individual clients of SC Advisors for said clients to use to make down payments on the residential properties they purchased. The defendant caused the creation of promissory notes to evidence the loans of down payments made to clients of SC Advisors, but he purposefully failed to record the promissory notes so that the notes would not appear on the clients' loan applications or credit histories.

As a further part of the program, the defendant and co-conspirators prepared and caused to be prepared, and

- 3 -

submitted and caused to be submitted, loan applications to lenders for purchase money mortgage loans on the residential properties purchased by individual clients of SC Advisors. The defendant and coconspirators concealed and omitted, and caused to be concealed and omitted, from these loan applications the material fact that the clients' down payments were borrowed and required to be repaid. In addition, they usually overstated, or caused to be overstated, the assets and understated, or caused to be understated, the liabilities of the clients on these loan applications.

Shortly after lenders approved the loan applications for purchase money mortgage loans and disbursed the loan proceeds, the defendant prepared and submitted, or caused to be prepared and submitted, loan applications to different lenders for home equity loans on the same properties for the same clients with the understanding that the clients would use the proceeds of the home equity loans to repay the down payments loaned to them, plus interest. As he did with the purchase money mortgage loan applications, the defendant concealed and omitted, and caused to be concealed and omitted, from these home equity loan applications the material fact that the clients' down payments were borrowed and required to be re-paid, and that the home equity loans were being sought in order to pay off the loans of down payments. Further, he usually overstated, or caused to be overstated, the assets and understated, or caused to be understated, the liabilities of clients on these loan applications, too.

The program also involved SC Properties identifying and arranging for people to rent the residential properties purchased by, and to provide property management services to, individual clients of SC Advisors, sometimes in exchange for a monthly property management fee. In some instances, the defendant failed to pay all expenses associated with the residential properties managed, including, but not limited to, loan payments and tax payments due, as promised. As a result, some of the loans on the properties went into default.

In or about June 2005, Tami Wescott became a client of SC Advisors. Ms. Wescott learned about the "no money down" program through a sales seminar the defendant presented. Consistent with the program, the defendant loaned Ms. Wescott $63,888.65 to be used to make a down payment on the property she was to purchase. Ms. Wescott executed a promissory note,

agreeing to repay SC Advisors the full amount of the down payment plus interest. The defendant did not record the promissory note. On or about June 30, 2005, the defendant caused the preparation and submission to First National Bank of Arizona of an application for a purchase money mortgage loan in the amount of $201,750 on behalf of Ms. Wescott in connection with her purchase of the property located at 3983 Coleridge Lane, Sarasota, Florida 34241. Unbeknownst to Ms. Wescott, the loan application omitted the material fact that Ms. Wescott's down payment had been loaned to her and was required to be repaid, and it contained material information that was false and fraudulent in that it represented that the home was to be Ms. Wescott's primary residence, when it was actually an investment property, and Ms. Wescott's income and assets were inflated.

Shortly after First National Bank of Arizona approved the loan application and disbursed the loan proceeds, the defendant caused the preparation and submission of another false and fraudulent loan application on behalf of Ms. Wescott, this time to Regions Bank for a home equity loan, the proceeds of which were used to reimburse the defendant for the amount of the down payment he had loaned to Ms. Wescott, plus interest. Ultimately, the residential property was the subject of a short sale, which resulted in a net loss to the lender of $93,750.

As of October 24, 2012, the losses incurred by the victim lenders in connection with 49 residential properties amount to $6,817,821.55.

Absent extraordinary circumstances, the above facts bind Seaborne.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Seaborne claims ineffective assistance of counsel, a difficult claim to sustain.

"[T]he cases in which habeas [applicant]s can properly prevail on the ground of

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d

1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386

(11th Cir. 1994)).  *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective

assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*, first, the
> defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced the defense. This
> requires showing that counsel's errors were so serious as to
> deprive the defendant of a fair trial, a trial whose result is reliable.
> *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

Strickland requires proof of both deficient performance and consequent

prejudice.  *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the

defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When

applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two

grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and

made all significant decisions in the exercise of reasonable professional judgment."

*Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must

judge the reasonableness of counsel's challenged conduct on the facts of the particular

case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires

that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Seaborne must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  466 U.S. at 691–92.  To meet this burden, Seaborne must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Although the *Strickland* standard controls a claim that counsel was ineffective for recommending that a client plead guilty, *Hill v. Lockhart*, 474 U.S. 52, (1985), *Agan v. Singletary*, 12 F.3d 1012 (11th Cir. 1994), the quantum of evidence needed to prove both deficient performance and prejudice is different.  "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decided to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial."  *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984).  To prove prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill*, 474 U.S. at 59.

### III. VALIDITY OF GUILTY PLEA

**Ground One**

Seaborne alleges that he "signed [his] plea agreement without understanding it fully and without properly being advised of the validity of the plea or its charges." (Doc. 1, p. 4)  Seaborne asserts that he understood when he pleaded guilty that counsel "was supposedly acting in the interest of the defense . . . when [counsel] stated that [the plea] was a good deal and everything was correct," but that counsel's ineffective assistance "caused [Seaborne] to receive a greater sentence from the court."  (Doc. 1, p. 4)  To the extent that Seaborne challenges the validity of his guilty plea based on trial counsel's alleged ineffective assistance, he cannot obtain relief.

"For a guilty plea to be entered knowingly and intelligently, 'the defendant must have not only the mental competence to understand and appreciate the nature and consequences of his plea but he also must be reasonably informed of the nature of the charges against him, the factual basis underlying those charges, and the legal options and alternatives that are available.'" *Finch v. Vaughan*, 67 F.3d 909, 914 (11th Cir. 1995) (quoting *Stano v. Dugger*, 921 F.2d 1125, 1142 (11th Cir. 1991)).  *See also United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) ("A court accepting a guilty plea must comply with Rule 11 and specifically address three 'core principles,' ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea.").  "[T]he representations of the defendant [at a Rule 11 plea hearing], as well as any findings

made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977).  Such representations are presumptively trustworthy and considered conclusive absent compelling evidence to the contrary.

During the plea colloquy Seaborne was advised of (1) the nature and elements of the charged offense, (2) the factual basis for the plea, (3) the terms of the plea agreement, (4) the rights he forfeited by pleading guilty, (5) the possible five-year sentence he faced, and (6) the consequence of the appellate waiver included in the written plea agreement.  (Doc. 43 in 8:12-cr-229, pp. 9–18, 21–30)  Seaborne affirmed under oath that he understood each of these provisions.  Additionally, Seaborne admitted his guilt, affirmed that he chose to plead guilty without threat or coercion, and expressed his satisfaction with counsel's representation.  (Doc. 43 in 8:12-cr-229, pp. 31–33)  The written plea agreement (Doc. 25, p. 1 in 8:12-cr-229), which Seaborne affirmed he read word for word and reviewed page by page with counsel, clearly states the maximum sentence Seaborne faced.

Aside from his own self-serving allegation, Seaborne produces no evidence substantiating his allegation that he involuntarily pleaded guilty.  Although afforded the opportunity, Seaborne during the plea colloquy expressed neither a misunderstanding of the maximum sentence he faced nor dissatisfaction with counsel.  Seaborne's sworn statements at the plea colloquy, as well as his signature on the plea

form, demonstrate the knowing and voluntary nature of his plea.  Seaborne's

unsubstantiated allegations to the contrary fail to overcome the strong presumption of

verity afforded his sworn statements during the plea colloquy.  *Blackledge*, 431 U.S.

at 73–74.  Because Seaborne "knew that there was a possibility that he could receive

the sentence that was imposed, his disappointment with the result is not grounds to set

aside the guilty plea." *Tahamtani v. Lankford*, 846 F.2d 712, 714 (11th Cir. 1988).  No

evidence supports Seaborne's argument that an error by counsel resulted in a greater

sentence than Seaborne would have otherwise received.  Seaborne neither establishes

the invalidity of his plea nor satisfies *Strickland's* requirements.  *Hill*, 474 U.S. at 59;

*Strickland*, 466 U.S. at 690.  Ground one warrants no relief.

## IV.  APPEAL WAIVER AND PRE-PLEA INEFFECTIVENESS

A valid plea waives both known and unknown challenges to the proceedings.

*Brady v. United States*, 397 U.S. 742, 757 (1970) ("A defendant is not entitled to

withdraw his plea merely because he discovers long after the plea has been accepted

that his calculus misapprehended the quality of the State's case or the likely penalties

attached to alternative courses of action.  More particularly, absent misrepresentation

or other impermissible conduct by state agents . . . a voluntary plea of guilty

intelligently made in the light of the then applicable law does not become vulnerable

because later judicial decisions indicate that the plea rested on a faulty premise.").

*Tollett v. Henderson*, 411 U.S. 258, 267 (1973), holds that a valid guilty plea waives a

non-jurisdictional defect:

- 10 -

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

This waiver of rights precludes most challenges to the conviction.  "[W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569. *See also United States v. Patti*, 337 F.3d 1317, 1320 (11th Cir. 2003) ("Generally, a voluntary, unconditional guilty plea waives all non-jurisdictional defects in the proceedings.").

This waiver of rights also includes a claim of ineffective assistance of counsel based on a pre-plea event. *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992). *Hutchins v. Sec'y, Dep't of Corr.*, 273 Fed. App'x 777, 778 (11th Cir.), *cert. denied*, 555 U.S. 857 (2008), explains:

> In his habeas petition, Hutchins alleges that his trial counsel was ineffective for failing to explicitly define and advise him of a statute of limitations defense prior to advising him to waive that defense and plead guilty.  Hutchins's voluntary guilty plea, however, waived any ineffective assistance of counsel claim.

Consequently, Seaborne's guilty plea waives both a substantive claim (other than a jurisdictional challenge) and a purported failing of counsel that occurred before entry of the plea.

In grounds two through ten and ground twelve Seaborne challenges counsel's pre-plea performance.[2]  Although he now complains that counsel's performance was deficient, when Seaborne pleaded guilty he expressly stated his satisfaction with counsel's representation.  (Doc. 43, p. 33 in 8:12-cr-229)  Seaborne also stated that he pleaded guilty only because he is, in fact, guilty.  (Doc. 43, p. 35 in 8:12-cr-229)  Even

---

[2]  Seaborne alleges that counsel rendered ineffective assistance by:

Ground Two:  not investigating or interviewing both government witnesses and defense witnesses

Ground Three:  refusing to provide effective assistance during "the plea agreement stage" and by not investigating the accuracy of both the charges and monetary damages

Ground Four:  not reviewing and challenging the accuracy of the government's evidence of the damages owed to victim Gerald Abraham

Ground Five:  not reviewing and challenging the accuracy of the government's evidence of the damages owed to victim Al Lawrence

Ground Six:  not reviewing and challenging the accuracy of the government's evidence of the damages owed to victim Jessica Leis

Ground Seven:  not verifying the amount of money that the government alleges Seaborne owes Wells Fargo Bank

Ground Eight:  not verifying the amount of money that the government alleges Seaborne owes Bank of America

Ground Nine:  not verifying the amount of money that the government alleges Seaborne owes Deutche Bank

Ground Ten:  not fully investigating or breaking down "the specific details of the 49 mortgages that presumably added [a] significant amount of restitution well into the millions of dollars"

Ground Twelve:  refusing to argue that "[t]here exists no element of conspiracy as there are no other conspirators nor ha[s] there ever been during the course of this case"

if counsel's performance was deficient, Seaborne cannot prove prejudice because he does not contend that he would not have pleaded guilty. *Hill*, 474 U.S. at 59 ("[T]he defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."). Grounds two through ten and ground twelve warrant no relief.

**Ground Eleven**

Seaborne also includes in his motion ground eleven (Doc. 1, p. 13) which states:

> The sentence imposed for a first time offender, 70 years of age, and who[se] conviction was based on false and fabricated evidence is substantial [a]s is more fully outlined in the § 2255.

This allegation presents no constitutional claim or basis for relief. To the extent that Seaborne challenges the calculation of his sentence he cannot obtain relief because the challenge is barred by both the appeal waiver and entry of his voluntary guilty plea.

Accordingly, the motion to vacate under 28 U.S.C. § 2255 (Doc. 1) is **DENIED**. The clerk shall enter a judgment against Seaborne and close this case.

## DENIAL OF BOTH CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS

Seaborne is not entitled to a certificate of appealability. A prisoner moving under Section 2255 has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a

certificate of appealability, Seaborne must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise.  *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001).  Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Seaborne is entitled to neither a certificate of appealability nor an appeal *in forma pauperis.*

Accordingly, a certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Seaborne must obtain permission from the circuit court to appeal *in forma pauperis.*

ORDERED in Tampa, Florida, on September 6, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE